**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MICHAEL LOUIS BEATTIE, | ) NO. CV 18-3372-JGB(E) |
| Plaintiff, | ) |
| v. | ) REPORT AND RECOMMENDATION OF |
| L. HALEEN, et al., | ) UNITED STATES MAGISTRATE JUDGE |
| Defendants. | ) |

This Report and Recommendation is submitted to the Honorable Jesus G. Bernal, United States District Judge, pursuant to 28 U.S.C. section 636 and General Order 05-07 of the United States District Court for the Central District of California.

**PROCEEDINGS**

Plaintiff, a state prisoner, filed this civil rights action pursuant to 42 U.S.C. section 1983 on April 23, 2018.  Plaintiff alleges that health care providers at the California Men's Colony, East ("CMC-East") denied Plaintiff constitutionally adequate medical

1  care for his ulcerative colitis, pain and related conditions.  The
2  original Complaint named as Defendants: (1) licensed vocational nurse
3  L. Haleen; (2) registered nurses S. Gonzalez, K. Casabar and N.
4  Johnson; and (3) ten fictitious Defendants identified as doctors and
5  nurses employed at CMC-East.

6

7       On November 30, 2018, the Court dismissed the Complaint with
8  leave to amend.  On April 1, 2019, Plaintiff filed a verified First
9  Amended Complaint identifying the Defendants as: (1) medical doctors
10 Dillen and Ward; (2) registered nurses Gonzalez, Casabar and Villez.

11

12      On April 29, 2019, Defendants Gonzalez and Casabar filed a motion
13 to dismiss the First Amended Complaint.  On June 25, 2019, the Court
14 denied the motion to dismiss.

15

16      Defendants Gonzalez and Casabar filed an Answer on July 23, 2019
17 ("Defendants Gonzalez' and Casabar's Answer").  Defendant Ward filed
18 an Answer on January 14, 2020. ("Defendant Ward's Answer").

19

20      On January 28, 2020, the Court ordered Plaintiff to show cause in
21 writing why the action should not be dismissed against Defendants
22 Dillen and Villez for failure to effect timely service of process.
23 Plaintiff did not file any timely response to the order to show cause.
24 On March 3, 2020, the Court dismissed the action without prejudice as
25 against Defendants Dillen and Villez.

26

27      On October 27, 2020, Defendants Ward, Gonzalez and Casabar
28 ("Defendants") filed "Defendants' Motion for Summary Judgment, etc."

1    On the same day, the Court issued a Minute Order <u>inter alia</u> advising

2    Plaintiff of the requirements of Rule 56 of the Federal Rules of Civil

3    Procedure.  <u>See</u> <u>Rand v. Rowland</u>, 154 F.3d 952 (9th Cir. 1997) (en

4    banc), <u>cert. denied</u>, 527 U.S. 1035 (1999).  On December 28, 2020,

5    Plaintiff filed "Plaintiff's Motion Opposing Defendants' Motion for

6    Summary Judgment, etc.," accompanied by documents and a declaration of

7    Plaintiff.

8

9         **SUMMARY OF ALLEGATIONS OF VERIFIED FIRST AMENDED COMPLAINT**

10

11        In the verified First Amended Complaint, Plaintiff alleges:

12

13        Plaintiff has suffered from the serious medical

14        condition of "Ulcerative Colitis" ("UC") for over twenty

15        years (First Amended Complaint, p. 2).  The condition, which

16        is usually triggered by stress, effects a breakdown in the

17        lining of the colon, causing Plaintiff to experience

18        symptoms ranging from frequent bowel movements and watery

19        stool to severe abdominal pain, colonic convulsions, severe

20        blood loss and a "round the clock" urge to expel waste

21        (<u>id.</u>).  Plaintiff has been taking "numerous chemo-class

22        immunomudulators [sic] for more than 10 years" (<u>id.</u>).

23        Plaintiff also has taken "steroids and citotoxins [sic]"

24        (<u>id.</u>).

25

26        In 2014, Plaintiff signed "Advance Health Care

27        Directives" expressing his desire to "allow his medical

28        condition to run its course (when it flared up)" (<u>id.</u>, p.

3).  Plaintiff then indicated that he did not want any treatment for his UC condition, "only pain medications so as not to suffer needless pain" as his condition ran its course (id., pp. 3, 8).

In late 2015, while Plaintiff was housed at "Donovan state prison," Plaintiff's UC flared up (id., p. 3).  At that time, Plaintiff informed prison officials of Plaintiff's wishes (id.).  Plaintiff agreed to undergo any necessary screening or diagnostic tests to help plan for pain management as his condition ran its course (id.).

In April 2016, Plaintiff's condition became "quite painful" (id.).  A prison doctor at "R.J. Donovan prison" prescribed morphine to be used at night to help Plaintiff sleep, which was all Plaintiff was seeking at the time (id.).

In May of 2016, Plaintiff had a telemedicine consultation with his long time "GI specialist" at which Plaintiff's end-of-life wishes were discussed (id.).  The specialist approved Plaintiff's request for non-opiate pain medication for daytime and low dose morphine at night to help Plaintiff sleep (id.).  Plaintiff's specialist approved this pain medication regimen (id.).

By late May of 2016, Plaintiff's condition was growing worse (id.).  Plaintiff needed diapers to function away from

the toilet (id.).  On or about May 26, 2016, Plaintiff was
transferred to CMC-East (id.).

On May 31, 2016, Plaintiff had an initial doctor's
visit with Defendant Ward, during which Plaintiff discussed
his medical wishes (id.).  Ward expressed opposition to
Plaintiff's end-of-life decisions and said that he, Ward,
would not authorize pain medication for Plaintiff (id.).  An
argument occurred during which Plaintiff reiterated his
right to refuse treatment and his right to allow his
condition to run its course without suffering unnecessary
pain (id., pp. 3-4).  Ward again expressed disagreement with
Plaintiff's decision and stated that, although Plaintiff
could do what he wished, Ward would refuse to provide
Plaintiff with pain medication and "would make sure
plaintiff's ordeal was painful" (id., p. 4).  Ward said he
would take away Plaintiff's morphine and would begin taking
away Plaintiff's daytime Tramadol (id.).

On June 6, 2016, Plaintiff had another visit with Ward,
during which another argument occurred concerning
Plaintiff's choices (id.).  Ward said he was "fundamentally
opposed" to Plaintiff's decision to let his UC condition run
its course (id.).  When Plaintiff said that Ward must
recognize Plaintiff's rights, Ward responded "but I can make
it very painful for you" (id.).  Ward said he, Ward, already
had gone to "the pain committee" and had caused Plaintiff's
morphine to be discontinued and Plaintiff's daily Tramadol

dose to be decreased from 200 mg to 150 mg (id.).  Ward said
that he, Ward, would look into having Plaintiff declared
mentally incapable of making these decisions (id.).  Ward
said he, Ward, would "make this time the most painful
plaintiff [had] ever had" because Ward opposed these kinds
of end-of-life decisions (id.).

Beginning on or about June 6, 2016, Ward discontinued
Plaintiff's morphine and decreased Plaintiff's dosage of
Tramadol (id.).  Plaintiff's condition began to deteriorate
(id.).  Between June 6, 2016 and June 20, 2016, Plaintiff
submitted more than twenty requests for medical help,
stating that Plaintiff was in pain, was suffering UC
symptoms, and was asking that his pain medications be
adjusted (id., pp. 4-5).  Plaintiff pleaded for help on June
7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18 and 19, 2016
(id., p. 5).

On June 7, 2016, Plaintiff saw Defendant Gonzalez
(id.)[1].  Plaintiff described his condition and his
position regarding palliative care (id.).  Gonzalez said she
could not understand why Plaintiff refused UC treatment and
called Plaintiff's decision "stupid" (id.).  When Plaintiff
tried to explain that he had a right to refuse treatment,

_____

[1]   The First Amended Complaint spells Defendant Gonzalez'
name as "Gonzales."  However, the documents filed by Defendants
and some of Plaintiff's Exhibits submitted in opposition to the
Motion for Summary Judgment make it clear that the correct
spelling is "Gonzalez."

1   Gonzalez told Plaintiff that she had spoken with Ward and

2   that, while Plaintiff could refuse treatment, medical staff

3   including Gonzalez did not have to treat Plaintiff's pain

4   (id.).  Gonzalez said, "the pain management committee

5   already approved the doctors [sic] request to discontinue

6   your pain medications" (id.).  Gonzalez told Plaintiff,

7   "[a]ll you have to do is take your treatment again and we

8   can re-order you your pain meds." (id.).

9

10   On June 8, 2016, Plaintiff collapsed in the shower

11   (id.).  A nurse, Villege, responded to the scene, and

12   Plaintiff was transported to the infirmary (id.).  The nurse

13   told Plaintiff that medical staff members were aware of

14   Plaintiff's condition, and that staff would not treat

15   Plaintiff's pain because of Plaintiff's "refusal of

16   treatment stance" (id.).  The nurse said medical staff would

17   provide pain medication if Plaintiff accepted his treatment

18   (id.).  The nurse made a phone call to the "on-call" doctor

19   and said that Plaintiff was displaying signs of active UC,

20   that Plaintiff was taking a "palliative stance" on treatment

21   and that Dr. Ward did not wish to treat Plaintiff's pain

22   until Plaintiff agreed to treatment for his condition (id.,

23   pp. 5-6).  Plaintiff received nothing for his pain (id., p.

24   6).

25

26   On June 10, 2016, guards called infirmary staff because

27   Plaintiff reported pain (id.).  An unidentified nurse

28   arrived, berated Plaintiff and told the guards that "we've

already been through this with him" (id.).  The nurse said
she would not help Plaintiff until Plaintiff agreed to
accept treatment (id.).  The nurse said, "[y]ou will sit
here and suffer as long as you hold out against treatment,"
and the nurse left without providing any care (id.).

By June 12, 2016, Plaintiff was "tapping out" of his
decision to let his UC condition run its course, and he
requested the resumption of treatment for that condition
(id., p. 9).  In response to a series of medical requests,
Defendant Casabar saw Plaintiff on June 12, 2016 (id., p.
6).  Casabar asked whether Plaintiff was ready to resume
treatment (id.).  Plaintiff said "yes" and asked when
treatment could start (id.).  Casabar responded that medical
staff officials were "not in a big hurry to help plaintiff"
(id.).  Casabar said, "[y]ou brought this on yourself . . .
so you can just suffer the consequences" (id.).  At this
point, Plaintiff's weight was down to 118 pounds and
Plaintiff was in obvious distress (id., p. 7).

Plaintiff asked that either: (1) he receive Prednisone
right away; or (2) he receive pain medication until
treatment was resumed (id.).  While asking Casabar for help,
Plaintiff literally cried, saying he could not take the pain
anymore (id., p. 7).  Casabar said "no one was in a hurry to
rush in and save [Plaintiff]" (id.).  Casabar added, "You
brought this on yourself.  Now you can deal with the pain on
your own." (id.).

1    Between June 12, 2016 and June 20, 2016, Plaintiff
2    continued to suffer extraordinary pain, as well as
3    deterioration in his underlying condition (id.).  Despite
4    Plaintiff's requests and pleas for help, and despite the
5    obvious severity of Plaintiff's condition, medical staff
6    including Defendant Ward "purposefully" allowed Plaintiff to
7    suffer further pain, causing Plaintiff's condition to
8    deteriorate (id.).
9
10    On June 20, 2016, plaintiff "was finally saved" (id.).
11    At that point, Plaintiff's weight was down to 95 pounds and
12    he was suffering not only from UC but also from a blood
13    infection (id.).  After being forced to "un-sign" his
14    Advanced Health Care Directives, Plaintiff was taken by
15    ambulance to a hospital emergency room, where tests
16    "revealed everything plaintiff had been saying" (id., p.
17    11).  The hospital gave Plaintiff Prednisone (id., p. 10).
18    Once Plaintiff agreed to restart his chemo and steroidal
19    treatments, the medical staff became responsive to his
20    needs, including his need for pain medication (id., p. 7).
21
22    Plaintiff claims that Defendants acted with deliberate
23    indifference to Plaintiff's serious medical needs during the
24    first ten days of June, 2016 by discontinuing Plaintiff's
25    pain medication for non-medical reasons, i.e., Defendants'
26    disagreements with Plaintiff's refusal of chemo treatment
27    (id., pp. 8-9).  Defendants also displayed deliberate
28    indifference between June 10 and June 20, 2016 by

9

1    intentionally delaying any care for Plaintiff's underlying

2    condition in order to punish Plaintiff for having exercised

3    his right to refuse medical treatment (id., pp. 8-9).

4    Plaintiff asked to resume his treatment and to receive

5    Prednisone (id., p. 9).  Plaintiff should have been

6    prescribed Prednisone as early as June 12, 2016, at a time

7    when Plaintiff weighed 118 pounds (id.).  Instead,

8    Defendants chose to let Plaintiff suffer eight more days

9    (id.).  When Plaintiff finally received Prednisone at the

10   hospital, Plaintiff's condition improved within a single day

11   (id., p. 10).

12

13       Plaintiff seeks declaratory relief and compensatory and

14   punitive damages (id., pp. 11-12).

15

16                    **DEFENDANTS' CONTENTIONS**

17

18   Defendants contend:

19

20       1.  The evidence allegedly establishes that Defendants did not

21   act with deliberate indifference to Plaintiff's medical needs; and

22

23       2.  Defendants allegedly are entitled to qualified immunity.

24

25            **STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT**

26

27       Summary judgment is appropriate if the evidence, viewed in the

28   light most favorable to the nonmoving party, demonstrates that there

is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The party moving for summary judgment bears the initial burden of offering proof of the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where a plaintiff bears the burden of proof with respect to the merits of the plaintiff's claims, the defendants may meet their initial burden on summary judgment either by producing evidence negating an essential element of the plaintiff's claim or by showing that the plaintiff does not have enough evidence of an essential element to carry the plaintiff's ultimate burden of persuasion.  See Friedman v. Live Nation Merch., Inc., 833 F.3d 1180, 1188 (9th Cir. 2016); Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).

Once the moving party's burden is met, the party opposing the motion is required to go beyond the pleadings and, by the party's own affidavits or by other evidence, designate "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); Friedman v. Live Nation Merch., Inc., 833 F.3d at 1188 (where "a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense") (citation and quotations omitted); Miller v. Glenn Miller Productions, Inc., 454 F.3d 975, 987 (9th Cir. 2006).  A plaintiff who bears the burden of proof on the plaintiff's claims "'must produce at least some significant probative evidence tending to support the complaint'" in order to defeat summary judgment.  Smolen v. Deloitte, Haskins & Sells, 921 F.2d 959, 963 (9th Cir. 1990) (citation omitted).

1     The Court must "view the facts in the light most favorable to the

2  non-moving party and draw reasonable inferences in favor of that

3  party."  Scheuring v. Traylor Bros., Inc., 476 F.3d 781, 784 (9th Cir.

4  2007).  Where different ultimate inferences reasonably can be drawn,

5  summary judgment is inappropriate.  Miller v. Glenn Miller

6  Productions, Inc., 454 F.3d at 988.

7

8     A factual dispute is "genuine" only if there is a sufficient

9  evidentiary basis upon which a reasonable jury could return a verdict

10  for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S.

11  242, 248 (1986).  A factual dispute is "material" only if it might

12  affect the outcome of the lawsuit under governing law.  Id.  "At the

13  summary judgment stage, the court does not make credibility

14  determinations or weigh conflicting evidence."  Porter v. California

15  Dep't of Corrections, 419 F.3d 885, 891 (9th Cir. 2005) (citation

16  omitted).

17

18     A court may consider a verified complaint to be an affidavit

19  within the meaning of Fed. R. Civ. P. 56(e) to the extent that the

20  pleading demonstrates the plaintiff's personal knowledge of factual

21  matters stated therein.  See Schroeder v. McDonald, 55 F.3d 454, 460

22  (9th Cir. 1995).  Accordingly, the Court has considered the

23  allegations of Plaintiff's sworn First Amended Complaint.  However,

24  parties generally may not rely on unsworn allegations in their

25  pleadings or legal memoranda to defeat summary judgment.  See British

26  Airways Bd. v. Boeing Co., 585 F.2d 946, 952 (9th Cir. 1978), cert.

27  denied, 440 U.S. 981 (1979).  "Evidence may be offered 'to support or

28  dispute a fact' on summary judgment only if it could be presented in

1    an admissible form at trial." <u>Southern California Darts Ass'n v.</u>

2    <u>Zaffina</u>, 762 F.3d 921, 925-26 (9th Cir. 2014) (citing <u>Fraser v.</u>

3    <u>Goodale</u>, 342 F.3d 1032, 1036-37 (9th Cir. 2003), <u>cert. denied</u>, 541

4    U.S. 937 (2004)) (internal quotations omitted); <u>see also</u> <u>Fonseca v.</u>

5    <u>Sysco Food Servs. of Arizona, Inc.</u>, 374 F.3d 840, 846 (9th Cir. 2004).

6

7                        **SUMMARY OF EVIDENCE**

8

9    **I.  <u>Defendants' Evidence</u>**

10

11       In support of the Motion, Defendants rely on a few excerpts from

12   Plaintiff's deposition and on the declarations of Defendants Ward,

13   Gonzalez and Casabar.

14

15       The declarations of Defendants Ward, Gonzalez and Casabar are

16   legally insufficient, and hence the Court cannot consider them.  Under

17   28 U.S.C. section 1746, a declaration filed in federal court is

18   procedurally sufficient only if the declaration is signed and

19   subscribed in writing in substantially the following form: "I declare

20   (or certify, verify, or state) under penalty of perjury that the

21   foregoing is true and correct.  Executed on (date)."  Defendants'

22   declarations do not contain any statement that the declarant swears

23   under penalty of perjury that the contents of his or her declaration

24   are true and correct.  Moreover, the declarations of Defendants

25   Gonzalez and Casabar bear no date of execution.  Accordingly, in

26   ruling on the Motion for Summary Judgment the Court does not consider

27   the three declarations of the three Defendants.  See <u>In re World Trade</u>

28   <u>Center Disaster Litigation</u>, 722 F.3d 483, 488 (2d Cir. 2013) (omission

                                   13

of statement that declaration was made under penalty of perjury fatal; "[i]nclusion of the language 'under penalty of perjury' is an integral requirement of the statute for the very reason that it impresses upon the declarant the specific punishment to which he or she is subjected for certifying to false statements"); Nissho-Iwai American Corp. v. Kline, 845 F.2d 1300, 1306-07 (5th Cir. 1988) (purported affidavit omitting statement that it was made under penalty of perjury and that the contents were true and correct insufficient under section 1746; as drafted, the purported affidavit "allows the affiant to circumvent the penalties for perjury"); Kersting v. United States, 865 F. Supp. 669, 676 (D. Haw. 1994) (declaration is sufficient under section 1746 if it "contains the phrase 'under penalty of perjury' and states that the document is true"); see also Carter v. Boeing Co., 2016 WL 4595164, at *1 (W.D. Wash. Sept. 2, 2016) (refusing to consider purported declaration not signed under penalty of perjury on summary judgment); Khan v. Bank of America, N.A., 2015 WL 3919512, at *7 (N.D. Cal. June 25, 2015) (same); Davenport v. Bd. of Trustees Dist., 654 F. Supp. 2d 1073, 1084 (E.D. Cal.2009) (same).[2]

## II.  **Admissions by Defendants**

In their Answers, Defendants admitted certain facts alleged in the First Amended Complaint.  In their "Statement of Uncontroverted Facts, etc." ("SUF"), Defendants rely on, and hence appear to admit,

---

[2]    In any event, even if the Court were to consider Defendants' declarations, Plaintiff's evidence, discussed below, still would demonstrate the existence of material, triable issues of fact precluding summary judgment.

other facts alleged in the First Amended Complaint.  Still other
admissions by Defendants appear in Defendants' responses to
Plaintiff's Requests for Admissions ("RFAs"), submitted by Plaintiff
herein.  The Court summarizes Defendants' various admissions below:

Plaintiff suffers from ulcerative colitis, a condition
that involves inflammation of the colon (Defendants
Gonzalez' and Casabar's Answer, ¶ 5; Defendant Ward's
Answer, ¶ 5).  In 2014, while housed at the R.J. Donovan
Correctional Facility ("Donovan"), Plaintiff signed an
Advance Care Health Directive indicating that he did not
want to receive any treatment for his ulcerative colitis
except for pain medication (Defendants' SUF, Fact No. 4).

On May 26, 2016, Plaintiff was transferred from Donovan
to CMC (Defendants' SUF, Fact No. 8).  Defendant Ward saw
Plaintiff on May 31, 2016 (Defendants Gonzalez' and
Casabar's Answer, ¶ 11; Defendant Ward's Answer, ¶ 11).  At
that time, Plaintiff's reported weight was 128 pounds
(Plaintiff's Ex. 47, Defendant Ward's Response to RFA Set 1,
No. 17).  During that appointment, Plaintiff's only
complaint was his active ulcerative colitis (Plaintiff's Ex.
47, Defendant Ward's Response to RFA Set 1, No. 2).  During
that appointment, Ward reviewed Plaintiff's medical file,
which reflected Plaintiff's medical history of ulcerative
colitis and contained the "POLST" ["Physician Orders for
Life Sustaining Treatment"] and Advance Health Care
Directives (Plaintiff's Ex. 47, Defendant Ward's Responses

to RFA Set 1, Nos. 4, 9).  Plaintiff told Defendant Ward
about Plaintiff's palliative approach to the treatment of
Plaintiff's condition (Defendant Ward's Answer, ¶ 11).
Plaintiff made clear that he did not want any treatment for
his ulcerative colitis and wished only pain medication for
the pain caused by that condition (Plaintiff's Ex. 47,
Defendant Ward's Responses to RFA Set 1, Nos. 3, 7, 8).
Plaintiff made clear that he was suffering pain from his
ulcerative colitis and reported that morphine was providing
Plaintiff adequate pain relief at night (id., Defendant
Ward's Responses to RFA Set 1, Nos. 11, 13).  Ward discussed
the POLST and Advance Health Care Directives with Plaintiff,
and asked Plaintiff questions concerning Plaintiff's
treatment wishes, to which Plaintiff responded appropriately
(id., Defendant Ward's Responses to RFAs Nos. 5, 10).

Defendant Ward saw Plaintiff on June 6, 2016
(Defendants Gonzalez' and Casabar's Answer, ¶ 12; Defendant
Ward's Answer, ¶ 12).  On or about June 6, 2016, Plaintiff's
morphine was discontinued (Defendant Ward's Answer, ¶ 13).

Plaintiff submitted requests for medical care in which
he complained of pain and symptoms of ulcerative colitis and
requested changes in his pain medications (Defendants
Gonzalez' and Casabar's Answer, ¶ 14; Defendant Ward's
Answer, ¶ 14).  Defendant Gonzalez saw Plaintiff on June 7,
2016, at which time Plaintiff informed Gonzalez that
Plaintiff was suffering from ulcerative colitis (Defendants

Gonzalez' and Casabar's Answer, ¶ 15; Defendant Ward's Answer, ¶ 15; Plaintiff's Ex. 49, Defendant Gonzalez' Responses to RFA Set 1, Nos. 1, 2).  Plaintiff informed Gonzalez that Plaintiff was experiencing severe pain, which Plaintiff described as "off the charts" and Plaintiff said the pain was growing worse every day (Plaintiff's Ex. 49, Defendant Gonzalez' Response to RFA Set No. 1, No. 3). Plaintiff's bowel sounds were "hyperactive," a well known symptom of active ulcerative colitis, (id., Defendant Gonzalez' Responses to RFA Set No. 1, Nos. 6, 7).

Plaintiff submitted medical requests on and after June 12, 2016, in which he indicated a desire to resume treatment for his ulcerative colitis (Defendants Gonzalez' and Casabar's Answer, ¶ 26; Defendant Ward's Answer, ¶ 27).

On June 13, 2016, Plaintiff saw Defendant Casabar regarding Plaintiff's ulcerative colitis and Plaintiff's complaints of extreme pain (Plaintiff's Ex. 51, Defendant Casabar's Responses to RFA Set 1, Nos. 1, 2).  Plaintiff told Casabar that he wanted to restart his treatment drugs (Plaintiff's Ex. 51, Defendant Casabar's Response to RFA Set 1, No. 4)  After that visit, Casabar spoke with Defendant Ward regarding Plaintiff's pain medication and Plaintiff's request to restart his chemo drugs (Plaintiff's Ex. 52, Defendant Casabar's Responses to RFA Set No. 2, Nos. 17, 18).  On June 17, 2016, Casabar reviewed four of Plaintiff's "Health Care Services Request Forms" regarding Plaintiff's

1    ulcerative colitis (Plaintiff's Ex. 51, Defendant Casabar's

2    Response to RFA Set 1, No. 9).

3

4        Plaintiff's weight was measured at 95 pounds when he

5    was at the hospital on June 20, 2016 (Defendants Gonzalez'

6    and Casabar's Answer, ¶ 21; Defendant Ward's Answer, ¶ 22).

7    Plaintiff was prescribed Prednisone at the hospital on

8    June 20, 2016 (Defendants Gonzalez' and Casabar's Answer, ¶¶

9    26, 28; Defendant Ward's Answer, ¶ 27, 29).

10

11   **III.  <u>Plaintiff's Evidence</u>**

12

13       Plaintiff relies on his declaration and on certain accompanying

14   exhibits.  Plaintiff's evidence, accepted as true for purposes of the

15   Motion for Summary Judgment, shows the following:

16

17       **A.  <u>Background</u>**

18

19       Plaintiff first developed ulcerative colitis in "1997/1998" while

20   at other prisons (Declaration of Michael Louis Beattie ("Plaintiff's

21   Dec."), p. 1).  Doctors prescribed various steroids or "chemo class

22   drugs" for this condition (<u>id.</u>).

23

24       Plaintiff experiences periodic inflammatory "flare-ups" of his

25   colitis, likely caused by stress (<u>id.</u>).  The first sign of a flare-up

26   is always diarrhea for more than a week (<u>id.</u>, p. 2).  The steroid

27   Prednisone was and is one of the most well-known drugs for treatment

28   ///

18

of ulcerative colitis (id., pp. 1-2).[3]  Prednisone usually causes
Plaintiff to get "back in remission fairly quickly" and has always
been Plaintiff's "first line of defense" (id., p. 2).  If Plaintiff
does not receive Prednisone, or if Prednisone does not work,
Plaintiff's symptoms grow steadily worse (id., p. 3).  The lining of
Plaintiff's colon begins to break down, becomes ulcerated, bleeds a
lot and is very painful (id.).  Plaintiff's stools contain mucus and
either are bright red with blood or charcoal-like (id., p. 3).  If the
conditions persist for longer than a month, or if the symptoms worsen,
Plaintiff experiences painful cramping in his lower abdomen and
"violent involuntary muscle convulsions," which make sleeping
difficult (id., pp. 3-5).

    In 2010, while Plaintiff was incarcerated at Pelican Bay State
Prison, Chief Medical Officer Dr. Sayre wrote a "Medical
Classification Chrono" stating that Plaintiff's medical risk was "high
risk" and that Plaintiff needed "medium-intensity nursing"
(Plaintiff's Exs. 2, 4).  This chrono also stated, "UC on Remicaid"
(id.).  Dr. Sayre wrote Plaintiff a letter advising Plaintiff, inter
alia, that: (1) "[a]s in [Plaintiff's] case, [ulcerative colitis] is
typically a progressive disease that eventually involves destruction
of the entire colon," at which point the only option is removal of the
colon; (2) Dr. Sayre was not surprised that Plaintiff's Remicaid
prescription was "failing"; (3) Remicaid was "a very dangerous drug"

---

    [3]    See also Beattie v. Risenhoover, 2012 WL 4477687, at *1
n.4 (N.D. Cal. Sept. 27, 2012) ("Prednisone is a cortisteroid
that is used as an immune system suppressant in the treatment of
ulcerative colitis.").

that was "given at the very end of the medical treatment of Ulcerative Colitis"; (4) they "should use it [Remicaid] as long as there is any benefit"; (5) Plaintiff was receiving two other medications to help with comfort and reductions in symptoms; and (6) Plaintiff was encouraged to submit sick call slips ("7362") for any problems or unexpected changes in condition (Plaintiff's Ex. 2).

In June of 2014, Plaintiff decided to refuse further treatment for his ulcerative colitis condition, and Plaintiff then signed an Advance Health Care Directive (see Plaintiff's Ex. 6). (This Advanced Healthcare Directive is not in the record). In February of 2016, Plaintiff and a doctor signed a POLST stating, inter alia, that Plaintiff suffered from "ulcerative proctitis" and had elected: (1) the option of "Do Not Attempt Resuscitation/DNR"; and (2) receipt of "Comfort Measures Only" for his condition, i.e., the use of "medication by any route, positioning, wound care and other measures to relieve pain and suffering" (Plaintiff's Ex. 7).

In "March/April 2016," while Plaintiff was at R.J. Donovan prison, Plaintiff asked his medical team for morphine for the pain, only at night (Plaintiff's Dec., p. 5). A doctor granted Plaintiff's request (id., pp. 5-6). In a "Medical Progress Note," dated March 24, 2016, a doctor recorded that: (1) Plaintiff's height was 5 feet, 3 inches and his weight was 133 pounds; (2) Plaintiff reported that he "had a lot of pain" and wanted "the minimal dose of narcotic" to take at bedtime so that Plaintiff could sleep; (3) Plaintiff had refused any kind of medication for his ulcerative colitis since 2012 and had refused medication to reduce the inflammation and pain "such as

steroid suppositories"; (4) Plaintiff did not want to take any medication until he saw a gastroenterologist and had a colonoscopy which ruled out cancer; and (5) if Plaintiff did not have cancer, he would take regular medications as recommended (Plaintiff's Ex. 8). The doctor indicated that Plaintiff requested the lowest possible dose of narcotic, and that the doctor would prescribe 15 mg of morphine at bedtime (id.).  The doctor stated that it did "not appear that [Plaintiff was] showing drug seeking behavior" (id.).

On May 18, 2016, while at the Donovan prison, Plaintiff saw Dr. Shpaner, Plaintiff's long-time gastroenterologist, via a "telemedicine custody consultation" (Plaintiff's Ex. 9; Plaintiff's Dec, p. 6).  Dr. Shpaner recorded that: (1) Plaintiff previously had refused treatment, but finally decided to have a colonoscopy to learn his condition and prognosis; (2) Plaintiff probably would deny all treatment because he wanted to "know the condition of his disease and prognosis and let it run its course"; (3) Plaintiff complained about a period of worsening flare-ups with watery discharge and a moderate amount of bleeding, toilet visits 15 to 20 times per day, abdominal pressure and accidents; (4) Plaintiff wanted non-narcotic pain medication for use during the day; and (5) Plaintiff was taking morphine at night to help him sleep (id.).  Dr. Shpaner recorded Plaintiff's height at 5 feet 4 inches and his weight as 130 pounds (id.).  Dr. Shpaner prescribed 50 mg of Tramadol twice a day for abdominal pain, continued the morphine prescription and ordered Plaintiff scheduled for a colonoscopic examination and mucosal biopsies (id.).

///

///

A doctor completed a "Physician Request for Services" form on
May 18, 2016 for the colonoscopy, which was approved on May 23, 2016
(Plaintiff's Ex. 10).  A handwritten notation on this document states:
"5/25/16 - transferred to CIM, emailed UM RN's" (id.).  A Donovan
nurse's "Nurses Progress Notes," dated May 24, 2016, recorded that
Plaintiff was scheduled for transfer and that various medications were
placed in an envelope, including "Tramadol 100 mg PO Per MD Order"
(Plaintiff's Ex. 11).  The Notes listed "Future Appointments,"
including a "Telemed GI TBS" (id.).

In May of 2016, Plaintiff's condition was deteriorating
(Plaintiff's Dec., p. 6).  By the time of Plaintiff's transfer to CMC-
East, Plaintiff was wearing diapers and using sanitory wipes due to
blood loss (id.).

**B.  The May 31, 2016 Appointment With Defendant Ward**

After Plaintiff's transfer to CMC-East, Plaintiff saw Defendant
Ward on May 31, 2016 (Defendants Gonzalez' and Casabar's Answer, ¶ 11;
Defendant Ward's Answer, ¶ 11; Plaintiff's Dec., p. 6).  Ward appeared
to review Plaintiff's file on a computer, then asked Plaintiff why he
was there (Plaintiff's Dec., p. 6).  Plaintiff replied that he
suffered from ulcerative colitis, and Plaintiff described his
symptoms, including diarrhea, mucus discharge, blood loss, cramping,
loss of functionality and Plaintiff's struggle with pain and insomnia
(id., pp. 6-7).  Ward asked Plaintiff about taking Prednisone, Asacol
///
///

(Mesalamine)[4] or Remicaid, the latter an intravenous chemo drug which
Plaintiff had been prescribed (id., p. 7).  Plaintiff explained that
he did not want any treatment for his condition (id.).  Ward responded
authoritatively: "I won't help you with that" (id.).  Plaintiff
explained his rights and said that he had signed Advance Directives
and a POLST (id.).  Ward replied, "I saw that in your file.  Why are
you taking this stand?" (id.).  Plaintiff said it was "complicated"
and began to share his story, explaining his rationale for refusing
treatment (id.).  Plaintiff made it clear that he wanted only
palliative care, and said he did not want to suffer pain needlessly as
his condition ran its course (id.).

Defendant Ward said Plaintiff "seem[ed] much too young to make
such a decision" (id.).  Plaintiff responded that he was the one who
"gets to decide," that he had made his decision and that all Plaintiff
asked was that Ward respect and honor that decision (id.).  Plaintiff
said he did not want to suffer pain as his condition ran its course
(id.). Plaintiff explained that his condition was "getting pretty bad"
and asked for an increase in his morphine dose to three times a day
due to the growing pain and increased symptoms Plaintiff was
experiencing, including pressure in his colon, waves of muscle
contractions, heat flashes and sweating (id., pp. 7-8).

Defendant Ward "said he wouldn't help in any way" (id., p. 8).
Ward said, "I don't know why any doctors would allow you to do this"

---

   [4]   "Asacol is an anti-inflammatory medication used to
treat ulcerative colitis."  Beattie v. Risenhoover, 2012 WL
4477687, at *1 n.4.

(id.).  Plaintiff said, "It's my right to refuse treatment and not to be left in pain - needlessly" (id.).  Ward said, "Well you certainly have a right to do what you want, but I don't have to treat your pain" (id.).  Ward said, "You won't be getting morphine from me.  You'll suffer the pain of your ordeal by yourself." (id.).  The argument continued for several minutes and it became clear to Plaintiff that Plaintiff was not going to get anywhere (id.).

Defendant Ward wrote a "Medical Progress Note" concerning the May 31, 2016 meeting with Plaintiff (Plaintiff's Ex. 12).  Ward recorded Plaintiff's height as 5 feet 3 inches and his weight as 128 pounds (id.).  Ward stated that Plaintiff's medical history was, inter alia, "significant for ulcerative colitis x20 years" (id.).  Ward stated that Plaintiff reported worsening symptoms, including pain and diarrhea, which caused Plaintiff to want a colonoscopy, which would be "helpful with planning" (id.).  Ward reported: "We reviewed a Physician's Orders for Life Sustaining Treatment (POLST) form that was completed where [Plaintiff] states that **he wants comfort measures only related to this disease process**" (id.; original emphasis).

Defendant Ward recorded that he had discussed Plaintiff's use of narcotic analgesics, and that Plaintiff reported that he had used "MS Contin [morphine] 15 mg at night for amount a month" which had "helped significantly with his being able to sleep" (id.).  Plaintiff reported that abdominal pain had interfered with Plaintiffs' ability to sleep (id.).  Plaintiff also reported that he had been using Tramadol for a shorter time to help with his activities of daily living (id.).  Plaintiff reportedly did not want to use morphine during the day

24

because [Plaintiff] enjoyed reading during the day and did not want to be sedated (id.).  Ward recorded that Plaintiff found Tramadol to be "particularly effective," although Plaintiff reported a "midday drop in pain relief" and wanted to address that.  Ward suggested a lower dose of Tramadol three times a day and claimed that Plaintiff was "willing to try that" (id.).  Plaintiff also requested sanitary wipes "given his frequent diarrhea" (id.).

In the portion of the "Medical Progress Note" labeled "MEDICATIONS," Ward recorded, inter alia, that Plaintiff had six prescriptions, including prescriptions for: (1) "Morphine extended release 15 mg 1 table by mouth every evening"; and (2) "Tramadol 50 mg crush and float 2 tablets by mouth twice a day for pain" (id.).  Ward discontinued a prescription for a pain reliever Plaintiff reportedly said he was not using and a prescription for a medication for cramping that Plaintiff reportedly said was not effective (id.).

With respect to Plaintiff's ulcerative colitis, Ward's "Assessment/Plan" stated:

> Ulcerative colitis with a history of not being on immune suppressants for several years and adopting a palliative plan of care.  He has found MS Contin to be effective for pain at night.  Will present this to the Pain Committee as well as his use of Tramadol during the day.  Suggested a trial of Tramadol 50 mg t.i.d. to address the midday problem with pain management.  Request for Services (RFS) done for colonoscopy.

On May 31, 2016, Ward signed a "Health Care Services Physician Request For Service" form requesting the "diagnostic procedure" of a colonoscopy (Plaintiff's Ex. 36).  Ward stated that Plaintiff had a 20-year history of ulcerative colitis and had been refusing treatment, but "worsening of symptoms led to GI consult 5/18/16 that endorsed followup colonoscopy, RFS approved 5/23/16 at Donovan facility and then was transferred to Men's Colony, request that procedure be done here" (id.).  The Request was approved on June 8, 2016 (id.).  As indicated below, however, Plaintiff did not receive a colonoscopy until September 23, 2016, following Plaintiff's transfer to the California State Prison, Los Angeles County (see Plaintiff's Ex. 35; Plaintiff's Dec., p. 29).

### C.  Plaintiff's Requests for Health Care Services on June 4, 5 and 6, 2016

On Saturday, June 4, 2016, Plaintiff submitted a "Health Care Services Request Form," also known as a "CDC Form 7346" (Plaintiff's Ex. 14).[5]  Plaintiff requested a colonoscopy, "expedited to like tomorrow" (id.).  Plaintiff also asked to see the doctor regarding Plaintiff's pain medication, saying that his condition was "steadily getting worse," and that the pain "was becoming more than I can take"

---

[5]    The Court takes judicial notice of the days of the week of various dates mentioned herein.  See Fed. R. Evid. 201; Plotner v. AT & T Corp., 224 F.3d 1161, 1167 n.1 (10th Cir. 2000) (taking judicial notice "of the days of the week upon which the dates at issue fall"); Fisher v. United States, 2016 WL 11520616, at *2 (C.D. Cal. Nov. 23, 2016) (taking judicial notice that October 16, 2016 was a Sunday).

(id.).  Plaintiff said that his current pain medications were "no longer effective," that the matter was "urgent" and that his pain was "off the charts" (id.).

Plaintiff submitted a second "Health Care Services Request Form" on the same day, Saturday, June 4, 2016 (Plaintiff's Ex. 15). Plaintiff placed the notation "Urgent!" at the top of the form (id.). Plaintiff alleged that he suffered from ulcerative colitis and other problems, and that he was experiencing a moderate loss of blood and an increasing amount of pain (id.).  Plaintiff stated that the "newest development" was "pain/tingling" and nausea which felt "exactly like getting kicked in the gonads" (id.).  Plaintiff stated that he felt as if he was going to throw up and pass out (id.).  Plaintiff said that his symptoms signaled that Plaintiff had a blockage in the colon (id.).  Plaintiff again said that his pain was "completely off the charts" (id.).

Plaintiff submitted another "Health Care Services Request Form" on Sunday, June 5, 2016 (Plaintiff's Ex. 16).  Plaintiff stated that he was recovering from the most painful episode he had experienced in six months (id.).  According to Plaintiff, that afternoon Plaintiff had experienced pain signaling the need to pass waste (id.). Plaintiff recounted that, when Plaintiff sat on the toilet, Plaintiff experienced not only "normal intense pain" but Plaintiff also felt lightheaded and began throwing up (id.).  Plaintiff alleged that the pain was "beyond a 10" during the two minutes of this experience lasted (id.).
///

27

1    Defendant Gonzalez received and reviewed these three requests on

2  Monday, June 6, 2016.[6]  With respect to the first June 4 request,

3  Gonzalez recorded that Plaintiff was seen that day by his provider and

4  that the matter had been referred to "PCP Pain Management" with a

5  compliance date of June 30, 2016 (Plaintiff's Ex. 14).  On the second

6  June 4 Request, Gonzalez appeared to note "Referral to PCP" and

7  recorded that Dr. Ward had prescribed Plaintiff ibuprofen that day

8  (Plaintiff's Ex. 15).  With respect to the June 5 request, the

9  handwriting is unclear, but it appears Gonzalez recorded that

10  Plaintiff would be seen by Dr. Ward (Plaintiff's Ex. 16).

11

12    **D.  <u>Plaintiff's June 6, 2016 Appointment With Defendant Ward</u>**

13

14    Plaintiff saw Dr. Ward on Monday, June 6, 2016 (Plaintiff's Ex.

15  17a).  According to Plaintiff, the visit did not "go well"

16  (Plaintiff's Dec., p. 12).   When Ward asked how Plaintiff was doing,

17  Plaintiff said "not good," and said he needed morphine or something in

18  its place because Plaintiff could not "handle this pain" (<u>id.</u>).   Ward

19  asked: "Well are you ready to restart your treatment?" (<u>id.</u>).

20  Plaintiff said he did not want to take anything for his condition

21  (<u>id.</u>).  Ward responded, "Then your ordeal is going to get worse" and

22  "I told you I wouldn't help you with this process" (<u>id.</u>).   Ward

23  physically examined Plaintiff while the two argued (<u>id.</u>).

24  ///

25  ///

26

27    [6]    The record does not explain why medical personnel
apparently did not receive and review Plaintiff's June 4 and June
28  5 requests until Monday, June 6.

28

1    Plaintiff said that Plaintiff needed the morphine and that the
2    dose should be increased, not discontinued (id.).  Plaintiff said the
3    Tramadol was "not working at all" and made Plaintiff feel sick (id.).
4    Ward made it clear that, if Plaintiff agreed to restart his treatment
5    with Prednisone and the chemo drug Remicaid, Ward would provide
6    whatever pain medications Plaintiff wanted (id., pp. 12-13).
7    Plaintiff refused, telling Ward that Plaintiff had the right to refuse
8    chemo drugs and the right not to suffer pain as his condition ran its
9    course (id., p. 13).

10

11    According to Ward's "Medical Progress Note" concerning the
12    June 6, 2016 appointment with Plaintiff, at the time of the
13    appointment Plaintiff was 5 feet 3 inches tall and weighed 131 pounds
14    (Plaintiff's Ex. 17a).  Ward recorded that Plaintiff reported
15    significant abdominal pain and that Plaintiff said he lately felt that
16    "something has changed, causing increased pain and problems with
17    constant bowel movements" (id.).  Plaintiff requested a colonoscopy
18    (id.).  Ward stated that the colonoscopy had been scheduled at
19    Plaintiff's prior place of incarceration, and that, on the last visit
20    (apparently the May 31, 2016 visit), a "Request for Services had been
21    done for followup colonoscopy" (id.).  Ward recorded that Plaintiff
22    recently had been taking "MS Contin extended release" for pain and
23    Tramadol twice a day, and that, on the last visit, Ward had increased
24    the Tramadol to 50 mg three times a day (id.).  Ward reported that
25    Plaintiff said this was not working well (id.).  Ward reportedly
26    explained to Plaintiff that Plaintiff's case had been presented to the
27    Pain Committee on June 3, 2016 and that the Pain Committee was not
28    supportive of extended release morphine at night, but suggested trying

1    an increase of Tramadol to 100 mg three times a day "and check[ing]
2    his inflammatory markers" (id.).[7]   Plaintiff reportedly was "agreeable
3    to this plan" (id.).

5        With respect to Plaintiff's ulcerative colitis, Ward's
6    "Assessment and Plan" stated:

8        Chronic pain related to inflammatory bowel disease.  RFS
9        done for Telemedicine GI.  RFS is pending for colonoscopy
10       followup.  Trial of increasing Tramadol 100 mg 3 doses a
11       day.  Explained to him [Plaintiff] that there is no support
12       for using extended release morphine for inflammatory bowel
13       disease at this facility.  He is willing to try doing
14       without this medication.

16       Under "FOLLOWUP," Ward stated there would be a followup in 30
17   days "to follow up on laboratory work and pain control" (id.).

19       A "Medication Reconciliation" document recorded Plaintiff's
20   medications (Plaintiff's Ex. 17b).  This document appears to bear
21   Defendant Ward's signature and stamp, dated June 6, 2016.  The box
22   labeled "Stop" is checked next to Plaintiff's prescription for
23   extended release morphine (id.).  A "new rx" for Tramadol 50 mg three
24   ///
25   ///
26   ///

27   ———————————————————
28       [7]    In his unsworn Opposition, Plaintiff states that Ward
     was a member of the Pain Management Committee (Opposition, p. 5).

30

times a day (not 100 mg a day) is recorded (id.).[8]  In his

declaration, Plaintiff states that, on June 6, 2016, his morphine was

"cut" and his Tramadol was reduced (Plaintiff's Dec., p. 13).


Also on June 6, 2016, Defendant Ward signed a "Health Care

Services Physician Request for Services" form, requesting a

"Telemedicine GI" for Plaintiff (Plaintiff's Ex. 37).  Ward checked

the box labeled "Routine" rather than the boxes labeled "Urgent" or

"Emergent" (id.).  The Request was approved on June 14, 2016 (id.).


**E.  <u>Apparent Visit With a Mental Health Counselor</u>**


A document titled "Interdisciplinary Progress Notes - General,

signed on June 7, 2016, appears to reflect Plaintiff's visit with a

mental health counselor on that date (Plaintiff's Ex. 18).[9]  The Notes

indicate that Dr. Ward referred Plaintiff for "Bereavement," but

Plaintiff reported that he was not experiencing mental health concerns

or bereavement, but concerns regarding increased physical pain and

changes to his medication (id.).  The document records that a note

from "Interdisciplinary Panel Review 5/27/16 (formerly Pain Management

Committee)," stated: "Ward/Currently on Tramadol and MS Contin for

ulcerative colitis.  Recommendations: MS Contin is contraindicated

with IS's bowel condition, but Tramadol can be used so should DC the

_____

[8]     However, a partial record of Plaintiff's medications
indicates that, on June 6, 2016, Defendant Ward prescribed 100 mg
of Tramadol twice a day (Plaintiff's Ex. 32).

[9]     In his unsworn Opposition, Plaintiff states that his
psychologist authored these Notes (Opposition, p. 17).

MS Contin." (id.).[10]  The Interdisciplinary Panel Review note also states, inter alia, that Defendant Ward was "concerned that patient has a POLST and advanced directive and is fairly young for these" (id.).  The Interdisciplinary Review Panel note apparently was authored the day after Plaintiff's transfer to CMC-East and before Plaintiff's initial visit with Defendant Ward on May 31, 2016.

### F. Plaintiff's June 7, 2016 Request for Health Care Services and Triage Visit with Defendant Gonzalez

On Tuesday, June 7, 2016, Plaintiff submitted another "Health Care Services Request Form," labeled "EMERGENCY" at the top (Plaintiff's Ex. 19a).  Therein, Plaintiff stated:

> This is an emergency.  I am in constant severe pain in my
> stomach and abdomin [sic].  My condition is getting worst
> [sic] almost daily.  The pain is growing more constant and
> intense.  I cannot eat or sleep because of (1) this pain and
> (2) the need to use the bathroom.  I have had to use the
> toilet 20+ times in the past 12 hours.  The stool is
> unformed, charcoal black, with a lot of red blood.  And the
> pain is off the charts.

(id.).

---

[10]  Nothing in the record expressly explains why morphine, which Plaintiff's previous doctor prescribed and which Ward assertedly later prescribed in a "tapering dose" (as indicated below) allegedly was "contraindicated" for Plaintiff's condition.

Defendant Gonzalez received and reviewed the request that day (id.).  Plaintiff was escorted to the infirmary (Plaintiff's Dec., p. 14).  Gonzalez recorded Plaintiff's pain as a "7" on a scale of 1 to 10 and noted "hyperactive bowel sounds" (id.).  Gonzalez recorded Plaintiff's weight as 125 pounds (although Defendant Ward had recorded Plaintiff's weight as 131 pounds the day before) (id.).  On June 7, Plaintiff was weighed wearing chains, so he actually then weighed 122 pounds (Plaintiff's Dec., p. 14).  Gonzalez recorded that Plaintiff reported a feeling like a "growth or blockage" in his colon, that he had experienced stomach pain and nausea for the past "1-2 weeks," and that he had refused chemo for ulcerative colitis (Plaintiff's Ex. 19a).

Plaintiff described his condition and explained his refusal of treatment (Plaintiff's Dec., p. 15).  Plaintiff said that his symptoms were worsening and that he was suffering increased pain, as well as cramping, "muscle-spasm-like contractions" and blood loss (id.).  Plaintiff said he had developed new symptoms of vomiting and "heat-sweat flashes" (id.).  Gonzalez said:

> Yeah, well, I would imagine it would be painful.  It's hard
> to understand why you or anyone would refuse treatment and
> expect us to help you.  The whole thing seems stupid.

(id.).

After listening to Plaintiff's abdomen with a stethoscope, Gonzalez said, "Doctor Ward already told you, all you need to do is

33

take your treatment" (id., p. 16).  After Plaintiff confirmed that his
previous treatment had been Remicaid, a chemo drug given intravenously
in the hospital, Gonzalez said, "As long as you refuse your treatment
we aren't going to provide you opiates" (id.).

The conversation turned into an argument (id., p. 16).  Plaintiff
said:

> You guys can't do this. . . .  I have a right to do this.  I
> have a right to refuse chemo drugs and still have my pain
> addressed.  I'm sincere about my wishes.  I'm deteriorating.
> I'm in the process of dying.  My condition is getting bad.
> . . .  I have to sit on the toilet every 30 minutes and
> drain blood.  The cramping pain is off the charts.  All I'm
> asking is for someone to help me.  If the doctor won't
> listen to you, then I'm hoping you'll go over his head.  I
> know you can go to the Chief Medical Officer, or the
> supervising Nurse.

(id., pp. 16-17).

Gonzalez replied, "You want me to go around the doctor? . . . I'm
not going to do that.  What would make you think we have to help you
do this?" (id., p. 17).  Plaintiff said, "I can't do this" (id.).
Gonzalez asked if Plaintiff wanted to resume his treatment (id.).
Plaintiff said, "No. . . . No.  No I don't want my treatment.  I just
don't want to suffer like this.  I shouldn't have to suffer like this"
(id.).  Gonzalez responded, "Well, you can't have both" (id.).

1   Gonzalez never told Plaintiff about a tapering dose (id.).

2

3      On the "Health Care Service Request Form," Gonzalez noted, inter

4   alia, that a "pain management" appointment was "to be scheduled"

5   (Plaintiff's Ex. 19a).  The document also bears a handwritten notation

6   stating "Ordered tapering dose of immediate release morphine,"

7   apparently bearing Defendant Ward's initial and a stamp dated June 7,

8   2016 (id.).

9

10     Also on June 7, 2016, Gonzalez wrote "Interdisciplinary Notes,"

11  indicating she had spoken to Ward about Plaintiff's June 7 Health Care

12  Services Request ("Plaintiff's Ex. 19b).  Gonzalez related that,

13  during the assessment in triage that day, Plaintiff had said he had

14  refused treatment in the past, that he had the right to do so, and

15  that he needed a colonoscopy (id.).  Gonzalez recorded that Plaintiff

16  was "argumentative about his ulcerative colitis" (id.).  Gonzalez

17  reported that she had informed Plaintiff that Ward had placed an order

18  "to slowly titrate morphine Dosage down" and that the plan was "to see

19  how [Plaintiff] tolerates this program" (id.).  Plaintiff also was

20  referred to the Pain Committee (id.).  Gonzalez also "sent an email to

21  UM regarding approved RFS for colonoscopy" and recorded that Ward

22  stated that Plaintiff had been "referred to GI as well" (id.).

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

### G. Plaintiff's Health Care Services Requests on June 10, 11, 12 and 13, 2016; the June 13, 2016 Triage Visit With Defendant Casabar

Plaintiff had his first "tapering dose" of morphine on the night of Tuesday, June 7, 2016 (Plaintiff's Dec., p. 18).  Wednesday was "terrible," Thursday was "worse," and Friday was "nothing but pain and suffering (Plaintiff's Dec., p. 18).  Plaintiff could not sleep more than an hour at a time (id.).  The days were "equally rough" (id.). Plaintiff was using the toilet every 30 minutes, was experiencing cramping and was "doubled over with abdominal pain" (id., pp. 18-19). Plaintiff experienced pressure and pain in the rectum, hot flashes, sweating, hyperventilating and vomiting simultaneous with blood and mucus draining from his rectum (id., p. 19).  Plaintiff was wasting away, deteriorating, losing weight, losing motor function and losing coordination (id.).  Plaintiff was in pain 24 hours a day (id.). Finally "tapping out," Plaintiff made the decision to restart treatment for his underlying condition (id.).

Plaintiff saw a doctor, possibly Dr. Dillen, on June 8, 2016 (Plaintiff's Ex. 21).  The doctor noted Plaintiff's prescriptions for Tramadol 50 mg three times a day and for "MS 15 mg" (id.).  The doctor prescribed anti-diarrheal medications and sent an email to Defendant Ward  (id.).

On Friday, June 10, 2016, Plaintiff submitted a "Health Care Services Request Form," stating that Plaintiff had been going downhill ever since he stopped chemo and that Plaintiff needed to "get back on

chemo" (Plaintiff's Ex. 23a).[11]  Defendant Casabar received and
reviewed the request on June 11, 2016 (id.).  The document contains
the following notations, apparently by Casabar: "seen by triage RN
6/13/16" and "see attached."  The exhibit contains no attachment.

Plaintiff submitted two "Health Care Services Request Forms" on
Saturday June 11, 2019, both of which were received and reviewed by
Casabar on June 12, 2019 (Plaintiff's Exs. 23B, 24; see Plaintiff's
Dec., p. 19).  Both requests bore the word "Emergency" at the top and
began with the words "This is an emergency" (Plaintiff's Exs. 23B,
24).  In both requests, Plaintiff stated that he had been suffering
extreme pain for seven days, that Plaintiff needed his pain medication
switched from morphine and Tramadol to Lyrica and that Plaintiff was
ready to resume his treatment with "ASOCAL/Prednisone/REMICAID"
(Plaintiff's Exs. 23b, 24).  Defendant Casabar received and reviewed
both Requests on June 12, 2016 and made the same notations on both
Requests, apparently on June 13, 2016: "seen by triage RN on 6/13/16"
and "see attached" (Plaintiff's Exs. 23B, 24).  However, the exhibits
contain no attachments.

Plaintiff submitted another "Health Care Services Request Form"
on Sunday, June 12, 2016 (Plaintiff's Ex. 25; Plaintiff's Dec., p.
19).  Plaintiff said he needed to see the doctor "ASAP" (Plaintiff's

---

[11]  An unidentified medical provider, possibly a nurse, saw
Plaintiff on June 10, 2016 (Plaintiff's Ex 22).  The provider
recorded that Plaintiff reported pain and the ineffectiveness of
his pain medication, and said he wanted to see a doctor (id.).
The provider purportedly assured Plaintiff that it was "not
emergency" and apparently told him he should pursue the matter
through the "7362 process" (id.).

Ex. 25).  Plaintiff said that he was in extreme pain and required a change in his pain medications to Lyrica (id.).  Plaintiff also said, "I can't do this anymore" and asked to resume his treatment with "ASOCAL, Prednisone, REMICAID, etc." (id.).  Plaintiff said, "But we need to do this Monday.  I can't handle this pain any more." (id.).

Defendant Casabar received and reviewed the Request on Monday, June 13, 2016, and saw Plaintiff in triage on that date (id.; see Plaintiff's Dec., p. 20).  Casabar recorded Plaintiff's weight as 118 pounds (down from 125 pounds recorded on June 7 and 131 pounds recorded on June 6, 2016) (Plaintiff's Ex. 25).  According to Plaintiff, because Plaintiff again was weighed wearing chains, his weight probably was 115 pounds (Plaintiff's Dec., p. 21).  Plaintiff was emaciated, had sunken eyes and looked like a skeleton (id.).  As Plaintiff began to explain his  situation, Casabar interrupted Plaintiff to say that she was aware of his case and asked if he was ready to resume his treatment (id., pp. 21-22).  Plaintiff said yes and asked if Casabar could get Plaintiff started on Prednisone and do something for Plaintiff's pain (id., p. 22).

Casabar said, "I don't know . . . I don't think anyone's in a hurry to help you.  You brought this on yourself so you may just have to live with the consequences until we're ready."  Plaintiff's Dec., p. 22).[12]  Casabar took Plaintiff's vitals, but did not examine Plaintiff at all (id.).  Plaintiff was crying, saying he could not take it any more and asking for help (id., p. 23).  Casabar said, "I

---

[12]    According to Plaintiff, "If those weren't [Casabar's] exact words, they were awfully close" (Plaintiff's Dec., p. 22).

doubt you're going to get anyone to rush in and save you. You brought this on yourself.  Now you have to deal with the pain. . . ." (id.).

Casabar recorded that Plaintiff was experiencing pain at a level of 7 on a scale of 1 to 10 associated with ulcerative colitis and diarrhea (Plaintiff's Ex. 25).  Casabar recorded that Plaintiff had reported that he had taken "chemo drugs" during the period 2009-2014, that he thereafter had refused treatment, but that "he wants to be started on it again" (id.). Casabar recorded the following: "Dr. Ward notified regarding inmate's complaints and request.  Dr. Ward stated that inmate was just seen in pain management committee and has been referred for a GI consult.  Instructed to continue medications as ordered." (Plaintiff's Ex. 25).  Casabar signed the Request as "completed" on June 13, 2016 (id.).

Also on June 13, 2016, Plaintiff submitted another "Health Care Services Request Form," again requesting a switch in his pain medication to Lyrica and the resumption of his treatment, including Asacol, Prednisone and Remicaid (Plaintiff's Ex. 26).  Plaintiff stated, "I can't do this - in too much pain - any more" (id.). Defendant Casabar received and reviewed this Request on June 14, 2016 and noted: "Seen by triage RN on 6/13/16" and "Above complaints/request has been discussed with Dr. Ward" (id.).  Casabar signed the Request as "completed" on June 14, 2016 (id.).

///
///
///
///

### H.  Plaintiff's Health Care Services Requests on June 15, 16 and 17, 2016

Over the next several days, Plaintiff's condition deteriorated further (Plaintiff's Dec., p. 24).  Plaintiff submitted five "Health Care Services Request Forms" between June 15, 2016 and June 17, 2016.

On June 15, 2016, Plaintiff submitted two "Health Care Services Request Forms."  In one Request, Plaintiff stated that he was suffering a lot of pain and needed to get back on his medications, including chemo (Plaintiff's Ex. 27).  Plaintiff said he had submitted three previous requests, but had not seen anyone (id.).  Plaintiff said, "I need to see the doctor ASAP/URGENT" (id.).  Defendant Casabar received and reviewed the Request on June 16, 2016 (id.).  Casabar wrote: "PCP [Primary Care Provider] by 6/27/20" and "See attached." (id.).  The document in the record contains no attachment.  Casabar signed the Request as "completed" on June 17, 2016 (id.).

In the other June 15, 2016 Request, Plaintiff wrote that he was experiencing pain 24 hours a day and that the pain level varied from 5 to at least 10 (Plaintiff's Ex. 28).  Plaintiff said that the need to be near a toilet, Plaintiff's inability to eat and the pain had taken over his life (id.). Plaintiff again wrote: "I need to see the doctor ASAP/URGENT" (id.).  Plaintiff said that a "gap" in pain medication from noon to 6 p.m. was "tortulous [sic]" and needed to be addressed (id.).  Plaintiff said he had submitted five Requests, but had still not seen anyone (id.).  Casabar received and reviewed the Request on June 16, 2016 and made the following notations: "PCP . . . by

40

6/27/16"; "C-scope by 8/29/16"; "Telemed by 9/4/16" and "See Attached." (id.). Casabar signed the Request as "completed" on June 17, 2016 (id.). The copy of the document in the record does not contain an attachment.

The next day, June 16, 2016, Plaintiff submitted two more "Health Care Services Request Forms" (Plaintiff's Exs. 29, 30). In one request, Plaintiff said he was trying to get treatment for his colitis and that this was his fifth request (Plaintiff's Ex. 29). Plaintiff stated, "I can't do this any more and want to start my treatment meds" (id.). Plaintiff added, "Please help. I can't handle the pain." (id.). The request does not contain a date of receipt or review, but does contain a notation by Defendant Casabar stating "see attached" (id.). Casabar signed the Request as "completed" on June 17, 2016 (id.). The document in the record does not contain any attachment.

In the other June 16 request, Plaintiff again stated he was suffering pain in his stomach and low abdomen 24 hours a day, ranging from a level of 5 to 10 when the pain medication wore off (Plaintiff's Ex. 30). Plaintiff said he could not sleep, eat, move around or function at all (id.). Plaintiff said that he had been begging to see a doctor to make changes in his pain medication, that he could not "live like this any more," and that he was "falling deep into depression from it" (id.). The request does not contain a date of receipt or review, but does contain a notation by Defendant Casabar stating:

///

///

41

1    Seen in triage on 6/13/16.  Above complaints and request has

2    [sic] been addressed.  Dr. Ward is aware.  Has PCP F/up for

3    change of medication by 6/27/16 . . . C-scope by 8/29/16 and

4    Telemed appt for ulcerative colitis by 9/4/16.

5

6    (id.).  The document in the record does not contain any attachment.

7    Casabar signed the Request as "completed" on June 17, 2016 (id.).

8

9    On June 17, 2016, Plaintiff submitted another "Health Care

10   Services Request Form," stating that he was in "a full blown crisis"

11   and "the worst [he had] ever been" (Plaintiff's Ex. 31).  Plaintiff

12   said, "I am in so much pain I can't function at all" (id.).  Plaintiff

13   stated, "Please, someone help me" (id).  Triage nurse Johnson (no

14   longer a Defendant) received and reviewed the request on June 27, 2016

15   (id.).  The record contains no explanation for the delay.  Johnson

16   wrote "see progress note," but no such note is attached to the

17   document in the record.

18

19   **I.   Plaintiff's Apparent Collapse, Subsequent Hospitalization**

20       **and Subsequent Treatment at Other Prisons**

21

22   Early on Monday, June 20, 2016, a "psych tech" found Plaintiff

23   lying on the floor of his cell in a pool of blood originating from his

24   rectum (Plaintiff's Dec., p. 28).  Plaintiff had been on the toilet

25   with "excuciatingly painful" cramps, draining blood and mucus, and

26   "kind of slid or slumped from the toilet to the floor of the cell"

27   (id.).  Plaintiff was taken to the infirmary and given fluids through

28   an I.V. (id.).  Defendant Ward approached Plaintiff and asked if

42

1   Plaintiff was ready to "revisit" Plaintiff's Advance Health Care plans
2   (id.).  Ward had the forms in his hand (id.).  Wanting the pain to
3   stop, Plaintiff signed some papers (id.).

4

5       According to a "Medical Progress Note" dated June 20, 2016 and
6   apparently authored by Defendant Ward,[13] Ward saw Plaintiff that day
7   because a pysch tech "expressed concern" about Plaintiff's condition
8   (Plaintiff's Ex. 34).  In the "Subjective" portion of the Note, Ward
9   stated that Plaintiff reportedly had been "having difficulty with pain
10  lately" and had "been concerned that there has been a change in his
11  ulcerative colitis and Gastroenterology and colonoscopy referrals are
12  pending" (id.).  Ward recorded Plaintiff's height as 5 feet 4 inches
13  and his weight as 95 pounds (id.).  Ward wrote:

14

15      [Plaintiff] has lost a significant amount of weight.  His
16      weight this morning is 95 pounds which would indicate over a
17      30-pound weight loss over the last month.  I talked to him
18      about his goals and care.  His Physician's Orders for Life
19      Sustaining Treatment (POLST) form, which we had discussed
20      earlier, stated that he wanted palliative measures only.

21

22      He is expressing a desire at this time to revise these goals
23      stating that he is not ready to be at end of life and would

24   _____

25      [13]   Plaintiff alleges that Ward saw Plaintiff on June 20,
26   2016, asked about Plaintiff's "Advance Healthcare Plans" and had
     Plaintiff transferred to the hospital (Plaintiff's Dec., p. 29).
27   Although the June 20, 2016 "Medical Progress Note" does not bear
     Ward's name or signature, the contents of the document support a
28   reasonable inference that Ward was the author.

1      like to restart treatment for ulcerative colitis.  I

2      discussed this with the team here and feel that it is in his

3      best interest to transfer him to a higher level of care at

4      this time to address his nutritional status and his work up

5      the underlying condition [sic] that has led to this weight

6      loss.  Discussed with Medical Officer of the Day as well as

7      the Chief Physician and Surgeon here.

8

9  (id.).

10

11     Ward's "Assessment/Plan" stated:

12

13     1.  Volume depletion.  Will transfer to the Triage and Treatment

14     area here and give a bolus of saline. . . .

15

16     2.  Weight loss.  Differential diagnosis here is broad, possible

17     exacerbation of ulcerative colitis.  He has expressed a desire

18     for no treatment in the past, but has recently been changing his

19     mind about this.  Will transfer to the hospital setting where

20     more aggressive treatment can be expedited.

21

22     3.  Chronic pain.  He is currently on Tramadol, no change at this

23     time, has been discussed with the pain committee, he had been on

24     extended release morphine once a day.

25

26  (id.).

27  ///

28  ///

1   Ward had Plaintiff transferred by ambulance "CODE 2" to an
2   outside hospital (Plaintiff's Dec., p. 29).  "CODE 2" "means that the
3   person might not make it" (id.).  Although a prisoner ordinarily is
4   transferred to a hospital in a prison van with several guards,
5   Plaintiff was transferred by ambulance "because they wanted the
6   medical technicians there in case something went bad" (id.).

7

8   A report from the Twin Cities Community Hospital, dated June 20,
9   2016, records that Plaintiff arrived at the hospital that afternoon
10  (Plaintiff's Ex. 46).  Plaintiff's "Chief Complaint" as related by the
11  CMC "Nursing Triage Note" was blood in stool, abdominal pain, history
12  of ulcerative colitis and a "30# weight loss in last 2 weeks" (id.).
13  The hospital doctor prescribed antibiotics and Prednisone (id.;
14  Plaintiff's Dec., p. 29).

15

16  On June 23, 2016, a prison doctor[14] completed a "Health Care
17  Services Physician Request for Services," stating that Plaintiff had
18  seen his "PCP", that Plaintiff had suffered a 30-pound weight loss
19  "over last couple months," currently weighed 95 pounds, was reporting
20  fatigue and weakness and "Acutely [sic] has Diffuse Abdominal Pain,
21  Diarrhea + Blood in Stool" (Plaintiff's Ex. 38).  The Request stated
22  that Ward discussed the case with Dr. Sprague and that Plaintiff had
23  "voluntarily chosen" not to treat his chronic ulcerative colitis
24  (id.).  The Request sought hospital services for evaluation and
25  ///

26

27      [14]   Although the Request identifies the "requesting
    physician" as "Mojica/Ward," the Request appears to have been
28  written and signed by a physician other than Defendant Ward.

treatment(id.).   The Request contained a check in the box marked
"Emergent" (id.).

Following his transfer to the California State Prison, Los
Angeles County, Lancaster, Plaintiff had a colonoscopy on
September 23, 2016 (Plaintiff's Ex. 35; Plaintiff's Dec., p. 29).  The
reviewing physician found conditions "compatible with Chronic
ulcerative colitis, remission" (id.).  A "Medication Reconciliation
Form" accompanying the reviewing physician's report recorded that
Plaintiff's medications included Lyrica and Tramadol (id.).  It is
unclear when Plaintiff began taking Lyrica.

On April 19, 2017, Doctor Shpaner authored a "Telemedicine
Custody Consultation Gastroenterology," memorializing a consultation
conducted on April 18, 2017 (Plaintiff's Ex. 56).  In April of 2017,
Plaintiff was confined at the California State Prison, Sacramento,
where he remains (id.).  Plaintiff's height was recorded at 5 feet
three inches and his weight at 138 pounds (id.).  Dr. Shpaner recorded
that a colonoscopy "from several months ago" showed "extensive
scarring through the colon, but no active disease" (id.).  Dr. Shpaner
stated that, during the previous four months, Plaintiff had
experienced three to four flare-ups of his ulcerative colitis
condition which necessitated the use of Prednisone (id.).  Plaintiff
indicated a desire to discontinue "all opiates," manage his condition
more naturally and resume a special diet (id.).  Dr. Shpaner recorded
that Plaintiff was maintaining his weight and otherwise had no
specific complaints (id.).  Dr. Shpaner's recommendations including
the continuation of Plaintiff's Lyrica prescription "for the next

several months at the current dose" and the discontinuation of Plaintiff's Tramadol prescription (id.).

**DISCUSSION**

**I.  Governing Legal Standards**

    **A.  Deliberate Indifference**

A prison official can violate a prisoner's Eighth Amendment right to be free of cruel and unusual punishment if the official is deliberately indifferent to the prisoner's serious medical needs.  See Farmer v. Brennan, 511 U.S. 825, 837 (1994); Estelle v. Gamble, 429 U.S. 97, 104 (1976); McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997).  "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'"  McGuckin v. Smith, 974 F.2d at 1059 (citation omitted); see also Lopez v. Smith, 203 F.3d at 1131 (examples of "serious medical needs" include "a medical condition that significantly affects an individual's daily activities," and "the existence of chronic and substantial pain"; citation and internal quotations omitted).  Defendants do not deny that Plaintiff's ulcerative colitis, pain and related conditions constituted serious medical conditions.

To establish deliberate indifference, a prisoner must show that prison officials knew of and disregarded an excessive risk to the

prisoner's health or safety.  Farmer v. Brennan, 511 U.S. at 837.  The
official must have been aware of facts from which the inference could
be drawn that a substantial risk of serious harm existed, and must
have also drawn the inference.  Id.  Thus, inadequate treatment due to
accident, mistake, inadvertence, or even gross negligence does not
amount to a constitutional violation.  Estelle v. Gamble, 429 U.S. at
105-06; Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004).  "[A]n
official's failure to alleviate a significant risk that he should have
perceived but did not, while no cause for commendation, cannot . . .
be condemned as the infliction of punishment."  Farmer v. Brennan, 511
U.S. at 838.

"Whether a prison official had the requisite knowledge of a
substantial risk is a question of fact subject to demonstration in the
usual ways, including inference from circumstantial evidence, . . .
and a factfinder may conclude that a prison official knew of a
substantial risk from the very fact that the risk was obvious."
Farmer v. Brennan, 511 U.S. at 842 (citations omitted); see Harrington
v. Scribner, 785 F.3d 1299, 1304-05 (9th Cir. 2015) ("obviousness of a
risk may be used to prove subjective knowledge,. . . [and] evidence of
obviousness may present a disputed fact to defeat summary judgment").

"The provision of some medical treatment, even extensive
treatment over a period of years, does not immunize officials from the
Eighth Amendment's requirements."  Edmo v. Corizon, Inc., 935 F.3d
757, 793 (9th Cir. 2019), cert. denied, 141 S. Ct. 610 (2020); see
also Lopez v. Smith, 203 F.3d 1122, 1132 (9th Cir. 2000) (to show
deliberate indifference, "[a] prisoner need not prove that he was

completely denied medical care"); <u>Berry v. Peterman</u>, 604 F.3d 435, 441
(7th Cir. 2010) (to show deliberate indifference, "a prisoner is not
required to show that he was literally ignored") (citation omitted).
Deliberate indifference "may appear when prison officials deny, delay
or intentionally interfere with medical treatment, or it may be shown
by the way in which prison physicians provide medical care."
<u>Hutchinson v. United States</u>, 838 F.2d 390, 394 (9th Cir. 1988); <u>see</u>
<u>also</u> <u>Colwell v. Bannister</u>, 763 F.3d 1060, 1066 (9th Cir. 2014) (prison
officials may act with deliberate indifference when they "deny, delay,
or intentionally interfere with medical treatment" (citation omitted);
<u>Snow v. McDaniel</u>, 681 F.3d 978, 986 (9th Cir. 2012) (citations
omitted), <u>overruled on other grounds</u>, <u>Peralta v. Dillard</u>, 744 F.3d
1076 (9th Cir. 2014) (en banc), <u>cert. denied</u>, 574 U.S. 1073 (2015)
("the way prison staff delivered medical care" may demonstrate
deliberate indifference").  To show deliberate indifference based on a
delay in medical treatment, a plaintiff must show that the delay
caused substantial harm to the plaintiff.  See <u>Wood v. Housewright</u>,
900 F.2d 1332, 1225 (9th Cir. 1990) (only delays that cause
substantial harm violate the Eighth Amendment); <u>Shapley v. Nevada Bd.</u>
<u>of State Prison Commissioners</u>, 766 F.2d 404, 407 (9th Cir. 1985)
(same).


     "Typically, a difference of opinion between a physician and the
prisoner — or between medical professionals—concerning what medical
care is appropriate does not amount to deliberate indifference."  <u>Edmo</u>
<u>v. Corizon, Inc.</u>, 935 F.3d 757, 786 (9th Cir. 2019), <u>cert. denied</u>, 141
S. Ct. 610 (2020) (citations, quotations and brackets omitted).  "But
that is true only if the dueling opinions are medically acceptable

1  under the circumstances." Id. (citation omitted); see also Jackson v.

2  McIntosh, 90 F.3d 330, 332 (9th Cir.), cert. denied, 519 U.S. 1029

3  (1996) ("where a defendant has based his actions on a medical judgment

4  that either of two alternative courses of treatment would be medically

5  acceptable under the circumstances, . . . [a plaintiff] must show that

6  the course of treatment the doctors chose was medically unacceptable

7  under the circumstances, . . . and the plaintiff must show that they

8  chose this course in conscious disregard of an excessive risk to

9  plaintiff's health.") (citations omitted).

10

11  **B.  Right to Refuse Medical Treatment**

12

13      Plaintiff had the right to make decisions regarding his medical

14  treatment, including the decision to refuse treatment and to make end-

15  of-life directives.  See Cruzan ex rel. Cruzan v. Dir., Mo. Dep't of

16  Health, 497 U.S. 261, 278 (1990); Benson v. Terhune, 304 F.3d 874, 884

17  (9th Cir. 2002); Thor v. Superior Court, 5 Cal. 4th 725, 731-49, 21

18  Cal. Rptr. 2d 357, 855 P.2d 375 (1993) (prisoner has right to refuse

19  life-sustaining treatment); Cal. Penal Code § 2600) (stating that a

20  prisoner may be deprived of only such rights as are reasonably related

21  to legitimate penological interests, but that "[n]othing in this

22  section shall be construed to overturn the decision in Thor v.

23  Superior Court, 5 Cal. 4th 725"); Cal. Probate Code § 4650(a) ("In

24  recognition of the dignity and privacy a person has a right to expect,

25  the law recognizes that an adult has the fundamental right to control

26  the decisions relating to his or her own health care, including the

27  decision to have life-sustaining treatment withheld or withdrawn.");

28  former Cal. Code of Regs., tit. 15, § 3351(c) ("When an inmate has a

valid advance health care directive or a valid executed Physicians
Orders for Life Sustaining Treatment (POLST) [sic], health care staff
shall act in accordance with the provisions of the advance health care
directive, or POLST, as provided by law.").[15]


II.   **Triable Issues of Fact Exist Regarding Defendants' Alleged
      Deliberate Indifference.**


        Defendants argue that the evidence shows only a difference of
opinion concerning the appropriate treatment for Plaintiff and that
Defendants did not deny Plaintiff treatment.  As indicated above, a
difference of opinion between a physician and a prisoner concerning
treatment does not constitute deliberate indifference where the
physician's opinion is "medically acceptable under the circumstances."
Edmo v. Corizon, Inc., 935 F.3d at 786 (citation omitted); Jackson v.
McIntosh, 90 F.3d at 332.  However, a prison health care provider's
refusal to provide treatment, or delay of treatment, for an
unacceptable or non-medical reason can constitute deliberate
indifference.  See Jackson v. McIntosh, 90 F.3d at 332 (on summary
judgment, defendant physicians were not entitled to qualified immunity
when plaintiff alleged that they denied him a kidney transplant
because of personal animosity); see also Egberto v. Nevada Dep't of
Corr., 678 Fed. App'x 500, 503-04 (9th Cir. 2017) (prison officials
interference with prisoner's treatment for non-medical reasons, such

_____

[15]   In 2018, after the events giving rise to Plaintiff's
claims, section 3351 was renumbered without substantive change.
The provisions of former section 3351 are now contained in
section 3999.210 (filed 8-6-2018 pursuant to section 100, title
1, California Code of Regulations (Register 2018, No. 32)).

as personal animus, could constitute deliberate indifference);
Wakefield v. Thompson, 177 F.3d 1160, 1165 (9th Cir. 1999) (prison
official's failure to provide inmate with prescribed medication
because official was "too busy" could show deliberate indifference);
Hartsfield v. Colburn, 371 F.3d 454, 457 (8th Cir. 2004), cert.
denied, 552 U.S. 1300 (2008) (delaying dental treatment on account of
prisoner's behavior issues could show deliberate indifference).

As discussed below, Plaintiff's evidence, taken as true for
purposes of this Motion, reasonably could show that Defendants denied
and/or delayed pain medication for Plaintiff due to Defendants'
personal disagreement with Plaintiff's choice to refuse treatment for
his underlying ulcerative colitis condition, and not for any
acceptable medical reason.  Furthermore, Plaintiff's evidence, if
credited, could show that Defendants deliberately disregarded
Plaintiff's descriptions of his deteriorating condition, objective
indicia of Plaintiff's deteriorating condition and Plaintiff's
eventual requests to resume treatment for his underlying condition.
Plaintiff's evidence reasonably could show that, as a result of
Defendants' actions and inactions, Plaintiff unduly suffered pain,
increasingly severe symptoms, a precipitous weight loss and the need
for an emergency hospitalization.

**Defendant Ward**

Plaintiff's evidence would permit the reasonable conclusions
that, on May 31, 2016, Defendant Ward was aware of: (1) the alleged
contents of Plaintiff's medical file, including Plaintiff's Advance

Health Care Directive and POLST;[16] (2) Plaintiff's ulcerative colitis
diagnosis and prior treatment and prescriptions, including
prescriptions for morphine at night and Tramadol during the day;
(3) the opinion of Plaintiff's prior physician that Plaintiff did not
appear to be exhibiting drug-seeking behavior; (4) the colonoscopy
order placed by Plaintiff's prior physician at the Donovan facility
and approved at that facility but never performed due to Plaintiff's
transfer to CMC; (5) Plaintiff's decision to forego treatment for his
underlying ulcerative colitis condition and to use only palliative
measures including pain medication; (6) the adequacy of morphine to
control Plaintiffs' pain at night; (7) Plaintiff's opposition to using
morphine during the day; and (8) Plaintiff's worsening condition.
Plaintiff's evidence, if credited, would support the reasonable
conclusion that, by June 6, 2016, Ward was aware that Plaintiff
reportedly was experiencing severe abdominal pain and constant bowel
movements.

According to Plaintiff's evidence, Ward nevertheless told
Plaintiff that Ward would not prescribe pain medication for Plaintiff
because Ward personally disagreed with Plaintiff's exercise of
Plaintiff's right to refuse treatment for his underlying ulcerative
colitis condition.  Assertedly knowing that Plaintiff was in great
pain, Ward allegedly said that Ward would not prescribe pain
medication unless Plaintiff resumed treatment for that underlying

---

[16]   See Jett v. Penner, 439 F.3d 1091, 1097 (9th Cir. 2006)
(prisoner plaintiff opposing summary judgment was "entitled to an
inference that [prison doctor] was aware of the filed grievance,
medical slips, and aftercare instructions in [Plaintiff's]
medical record").

condition.  Plaintiff's evidence, if credited, would permit a
reasonable conclusion that Ward cancelled, and later tapered, the
morphine previously prescribed by Plaintiff's prior physician, and
that Ward did so only because of Ward's personal disagreement with
Plaintiff's decision to receive palliative care only.

Although Defendant Ward's June 6, 2016 Medical Progress Note
states that "it was the Pain Management Committee's recommendation to
not be supportive of extended release morphine at night," nothing in
the record indicates that the Pain Management Committee's
"recommendation" prevented Ward from continuing Plaintiff's nighttime
morphine prescription.  To the extent Ward's statement, that there was
"no support for using extended release morphine for inflammatory bowel
disease at this facility," allegedly was based on an institutional
blanket policy of refusing to prescribe morphine for this disease, any
asserted reliance on such a blanket policy unrelated to a professional
assessment of Plaintiff's medical condition and needs could support a
finding of deliberate indifference.  See Colwell v. Bannister, 763
F.3d at 1069-70 (finding genuine dispute as to whether prison
officials acted with deliberate indifference when refusing to provide
doctor-recommended cataract surgery based on prison's "one eye only"
policy, and "not because non-treatment was a medically acceptable
option."); Snow v. McDaniel, 681 F.3d at 990 (doctor's statement "nope
— gonna let you suffer until you tell me its [sic] working or not" in
response to prisoner's request for additional pain medication was a
"textbook example of the state of mind required to violate the Eighth
Amendment."); Jett v. Penner, 439 F.3d 1091, 1098 (9th Cir. 2006)
(triable issue of fact as to whether doctor acted with deliberate

indifference by refusing to request an orthopedic consultation based on a "competing administrative concern" that it would require referral to a non-contracted facility); Franklin v. Dudley, 2011 WL 2493770, at *9 (E.D. Cal. June 22, 2011) ("A blanket policy denying narcotic pain medication to inmates in the general population regardless of medical need violates [the Eighth Amendment].").

Furthermore, if credited, Plaintiff's evidence also would show that: (1) Ward discontinued Plaintiff's morphine, then resumed only a "tapering dose" when Plaintiff's condition worsened; (2) after Defendant Casabar notified Ward of Plaintiff's descriptions of great pain and worsening symptoms and requests for a change in his pain medication on or about June 13, 2016, Ward simply continued Plaintiff's previously ordered medications;[17] (3) Ward knew by June 13, 2016, or at least by June 16, 2016, (via communication with Casabar) that Plaintiff had complained of debilitating pain and worsening symptoms, wanted a change in his pain medication and wanted to resume treatment, including Prednisone, for his underlying colitis condition; (4) Ward was aware that Plaintiff was scheduled for an appointment regarding a "change of medication" by June 27, 2016, yet did not advance the date of that appointment in light of Plaintiff's

---

[17]     Nothing in the record suggests that the Pain Management Committee constrained Defendant Ward in any way from prescribing other pain medication for Plaintiff, including morphine, or that Dr. Ward could not have consulted with the Pain Management Committee concerning Plaintiff's pain medications after receiving Casabar's reports.  The record suggests that the Pain Management Committee's role was to make "recommendations" to the treating physician (see Plaintiff's Ex. 18 (recording "Recommendations" from the "Interdisciplinary Panel Review 5/27/16 (formerly Pain Management Committee)")).

worsening condition and his requests for pain medication and
resumption of his colitis treatment; and (5) after June 16, 2016, and
despite the urgency of Plaintiff's previous multiple requests for help
containing descriptions of Plaintiff's worsening condition, worsening
pain and requests to resume his treatment and to receive Prednisone,
Ward did not take any action concerning Plaintiff's complaints and
requests until after Plaintiff's collapse on June 20, 2016.  A
reasonable juror could conclude that Ward, knowing of Plaintiff's
worsening condition and worsening pain, intentionally delayed
providing effective pain treatment for Plaintiff and delayed ordering
the resumption of treatment for Plaintiff's underlying condition,
delays which allegedly caused significant harm to Plaintiff.  See Edmo
v. Corizon, Inc., 935 F.3d at 793 (continuation with "ineffective
treatment plan" constituted deliberate indifference); Hunt v. Dental
Dep't, 865 F.2d 198, 200 (9th Cir. 1989) (reversing grant of summary
judgment for prison officials who allegedly were aware that the loss
of plaintiff's dentures was causing him severe pain, bleeding gums and
inability to eat properly, yet failed to take any action to relieve
his pain or to prescribe a soft food diet until new dentures could be
fitted); see also Arnett v. Webster, 658 F.3d 742, 754 (7th Cir. 2011)
("A prison physician cannot simply continue with a course of treatment
that he knows is ineffective in treating the inmate's condition.")
(citation omitted); McElligott v. Foley, 182 F.3d 1248, 1257–58 (11th
Cir. 1999) (summary judgment inappropriate under Eighth Amendment
standards, where jail doctor prescribed only ineffective medication
for inmate's increasingly severe symptoms of severe stomach pain and
cramps, vomiting and inability to eat); Hathaway v. Coughlin, 37 F.3d
63, 68 (2d Cir. 1994), cert. denied, 513 U.S. 1154 (1995) ("A jury

could infer deliberate indifference from the fact that [the defendant medical provider] knew the extent of [plaintiff's] pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [plaintiff's] situation.") (quoted with approval in Jett v. Penner, 439 F.3d at 1098; quotations omitted); Messner v. Murphy, 2016 WL 1389605, at *6-7 (E.D. Wisc. Apr. 6, 2016) ("Based on Messner's consistent complaints of abdominal pain and nausea, his testimony that he informed [prison doctor] of his history of colitis, and the failure of the prescribed medication to alleviate Messner's pain, the court concludes that a genuine dispute of material fact exists about whether and when [the doctor] was aware that Messner suffered from a serious medical condition."); Fellows v. Baca, 2013 WL 12238537, at *11 (C.D. Cal. June 27, 2013), adopted, 2013 WL 12238844 (C.D. Cal. Aug. 14, 2013) (under Eighth Amendment standards, continuing to prescribe only largely ineffective pain medication for inmate's "persisting complaints" of abdominal pain could show deliberate indifference to inmate's kidney stones); Chess v. Dovey, 2011 WL 567375, at *21 (E.D. Cal. Feb. 15, 2011), adopted, 2011 WL 1219268, E.D. Cal., Mar. 30, 2011) (denying summary judgment on Eighth Amendment claim where doctor "ignored plaintiff's complaint about the ineffective nature of the Tylenol, aspirin and other medications he was being given and the pain being suffered as a result"); Franklin v. Dudley, 2010 WL 5477693, at *6 (E.D. Cal. Dec. 29, 2010) (summary judgment for physician's assistant inappropriate where plaintiff was previously prescribed narcotic pain medication, but defendant provided only ineffective non-narcotic pain medication).

///

1    For the foregoing reasons, triable issues of fact exist

2    concerning Plaintiff's claim of deliberate indifference against

3    Defendant Ward.

4

5    **Defendant Gonzalez**

6

7    With respect to Defendant Gonzalez, Plaintiff's evidence would

8    permit the reasonable conclusions: (1) on June 7, 2016, Gonzalez saw

9    Plaintiff in response to Plaintiff's prior multiple requests for

10   health care services; (2) Plaintiff told Gonzalez that Plaintiff had

11   refused treatment for his underlying colitis condition; (3) Plaintiff

12   told Gonzalez about Plaintiff's increased pain, which Gonzalez

13   recorded as "7" on a scale of 1 to 10; (4) Gonzalez called Plaintiff's

14   refusal of treatment for colitis "stupid" and said Plaintiff could not

15   both refuse treatment and receive pain medication; (5) Gonzalez told

16   Plaintiff that Plaintiff would not receive opiates for pain as long as

17   he refused treatment for his underlying condition; and (6) Gonzalez

18   refused to "go around the doctor" to help Plaintiff.  Plaintiff's

19   evidence, if credited, would permit the reasonable conclusion that

20   Gonzalez refused to help Plaintiff obtain pain medication due to

21   Gonzalez' personal disagreement with Plaintiff's refusal of treatment

22   for his underlying colitis condition.  See Snow v. McDaniel, 681 F.3d

23   at 990; Jackson v. McIntosh, 90 F.3d at 332; Wakefield v. Thompson,

24   177 F.3d at 1165.  A reasonable juror could conclude from Plaintiff's

25   evidence that Defendant Gonzalez exhibited deliberate indifference to

26   ///

27   ///

28   ///

Plaintiff's serious medical needs.[18]  Accordingly, triable issues of fact exist concerning Plaintiff's claim of deliberate indifference against Defendant Gonzalez.

**Defendant Casabar**

Plaintiff's evidence would permit the reasonable conclusions that: (1) Defendant Casabar received Plaintiff's June 10, 2016 health care request on June 11, 2016 and received Plaintiff's two June 11, 2016 health care requests (both labeled "emergency" requests) on June 12, 2016, but did not respond to any of these requests until June 13, 2016; (2) the June 10 and June 11 health care requests informed Casabar that Plaintiff wanted to resume chemo, had been suffering extreme pain and needed his pain medications changed; and (3) on June 13, 2016, Casabar received Plaintiff's June 12, 2016 health care request which stated that Plaintiff was in extreme pain, could not handle the pain any more, and wanted a change in his pain

///

---

[18]    The fact that Defendants Gonzalez and Casabar were nurses, not physicians, does not necessarily absolve them of liability for deliberate indifference.  See Hamilton v. Endell, 981 F.2d 1062, 1067 (9th Cir. 1992), abrogated in part on other grounds, Saucier v. Katz, 533 U.S. 194 (2001) ("By choosing to rely upon a medical opinion which a reasonable person would likely determine to be inferior, the [non-medical] prison officials took actions which may have amounted to the denial of medical treatment and the 'unnecessary and wanton infliction of pain.'"); see also Berry v. Peterman, 604 F.3d 435, 443 (7th Cir. 2010) ("Although a medical care system requires nurses to defer to treating physicians' instructions and orders in most situations, that deference may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient.") (citations omitted).

medications to Lyrica and the resumption of his treatment including
Prednisone and Remicaid.

Plaintiff's evidence, if credited, would permit the reasonable
conclusions that, on June 13, 2016: (1) Casabar saw Plaintiff and
recorded his weight as 118 pounds, but did not even examine Plaintiff;
(2) Plaintiff was emaciated and weighed approximately 115 pounds
without chains; (3) Casabar recorded Plaintiff's pain as a "7" on a
scale of one to ten; (4) Plaintiff told Casabar that Plaintiff was
ready to resume treatment for his underlying condition and asked for
Prednisone and pain medication; (5) Casabar said that she did not
think anyone was "in a hurry to help" or to "rush in [to] save"
Plaintiff and that Plaintiff "brought this on [himself]" and might
"just have to live with the consequences until we're ready," without
any explanation of what "ready" meant; and (6) Casabar told Plaintiff
that he had brought his condition on himself and would have to deal
with the pain.

The medical records, if credited, show that Plaintiff's weight
descended from 131 pounds on June 6 to 125 pounds on June 7 (which
Plaintiff alleges actually was 122 pounds after subtracting the weight
of the chains he was wearing), and thereafter to 118 pounds on
June 13, six days later. Plaintiff's evidence permits the reasonable
inference that Defendant Casabar was aware of this precipitous weight
loss, yet did not respond to what obviously was an urgent need for
medical attention. Plaintiff's evidence, if credited, also would
permit the reasonable conclusion that, in response to Plaintiff's
health care requests on June 15, 16 and 17, 2016, Casabar did not take

steps to change Plaintiff's pain medication or to resume treatment for his underlying condition.  Plaintiff's evidence would show that, during this time, Plaintiff's weight decreased from 118 pounds on June 13 to 95 pounds on June 20, a loss of 21 pounds in a week, and that a week after Casabar saw Plaintiff and left Plaintiff untreated, Plaintiff collapsed in acute distress and was taken to the hospital.

A reasonable juror could conclude from Plaintiff's evidence that Defendant Casabar exhibited deliberate indifference to Plaintiff's serious medical needs by refusing to help Plaintiff and that Defendant did so merely because of Plaintiff's prior decision to exercise his right to decline treatment for his underlying condition.  A reasonable juror could conclude that Defendant Casabar refused to help while knowing that Plaintiff was in urgent need of help for his serious medical condition.  See Edmo v. Corizon, Inc., 935 F.3d at 793; Snow v. McDaniel, 681 F.3d at 990; Jackson v. McIntosh, 90 F.3d at 332; Wakefield v. Thompson, 177 F.3d at 1165; Fellows v. Baca, 2013 WL 12238537, at *11; Chess v. Dovey, 2011 WL 567375, at *21. Accordingly, triable issues of fact exist concerning Plaintiff's claim of deliberate indifference against Defendant Casabar.

### B.  Defendants Are Not Entitled to Qualified Immunity

The defense of qualified immunity protects government officials from liability for civil damages as long as the officials' conduct does not violate clearly established constitutional or statutory rights of which a reasonable person would have known.  Pearson v. Callahan, 555 U.S. 223, 231 (2009); Harlow v. Fitzgerald, 457 U.S.

800, 818 (1982).  "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he or she is doing violates that right."  See Taylor v. Barkes, 575 U.S. 822, 135 S. Ct. 2042, 2044 (2015) (citations and quotations omitted); see also White v. Pauly, 137 S. Ct. 548, 552 (2017) (reiterating "the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality'") (citation omitted).

"If a genuine issue of material fact exists that prevents a determination of qualified immunity at summary judgment, the case must proceed to trial."  Bonivert v. City of Clarkston, 883 F.3d 865, 872 (9th Cir. 2018) (citation and quotations omitted); see also Wilkins v. City of Oakland, 350 F.3d 949, 956 (9th Cir. 2003), cert. denied, 543 U.S. 811 (2004) ("Where the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate.") (citation omitted).  Where an issue of fact exists concerning a prison official's deliberate indifference, qualified immunity is inappropriate.  See Jackson v. McIntosh, 90 F.3d at 332 (on summary judgment, defendant physicians were not entitled to qualified immunity when plaintiff alleged that they denied him a kidney transplant because of personal animosity); Trap v. United States, 2016 WL 6921128, at *3 (C.D. Cal. May 12, 2016) ("deliberate indifference and qualified immunity are mutually exclusive") (citation omitted).

///

///

At the time of the events alleged here, it was clearly established that prison officials could not be deliberately indifferent to an inmate's serious medical needs, including serious and prolonged pain. See Farmer v. Brennan, 511 U.S. at 837; Lopez v. Smith, 203 F.3d at 1131; Leichner v. United States, 2019 WL 8112470, at *27 (C.D. Cal. Mar. 29, 2019), adopted, 2019 WL 8112503 (C.D. Cal. Aug. 14, 2019) ("By 2003, when Plaintiff began seeking medical care at MDC-LA, it was beyond serious dispute that a prison physician had a duty to address a prisoner's repeated complaints of chronic pain and other potentially severe physical symptoms."). It was clearly established that prison medical officials could not delay treatment of an inmate's serious medical needs, continue to supply only ineffective treatment, or refuse treatment for unacceptable or non-medical reasons. See Colwell v. Bannister, 763 F.3d at 1066; Lopez v. Smith, 203 F.3d at 1132; Jackson v. McIntosh, 90 F.3d at 332; Wakefield v. Thompson, 177 F.3d at 1165; Hunt v. Dental Dep't, 865 F.2d at 200.

As discussed above, Plaintiff's evidence, taken as true for purposes of this Motion, shows the existence of issues of fact concerning Defendants' alleged statements, actions and inactions with respect to Plaintiff's pain and ulcerative colitis. Defendants are not entitled to qualified immunity on summary judgment. See Jackson v. McIntosh, 90 F.3d at 332; see also Reed v. Barcklay, 634 Fed. App'x 184, 186 (9th Cir. 2015) (qualified immunity unavailable where, "viewing the facts in the light most favorable to Reed, Dr. Barcklay deliberately chose not to provide effective medication that Reed had long been prescribed for serious migraines despite the substantial risk of harm to Reed. It was clearly established that a physician's

failure to provide treatment that would alleviate an inmate's significant pain could constitute deliberate indifference in violation of the Eighth Amendment."); <u>Owens v. Clark</u>, 2018 WL 4090600, at *13 (E.D. Cal. Aug. 27, 2018), <u>adopted</u>,, 2018 WL 4698321 (E.D. Cal. Sept. 28, 2018) ("a reasonable doctor would have known that failing to prescribe plaintiff alternative pain medication that adequately managed his chronic pain would violate plaintiff's Eighth Amendment rights"; defendant not entitled to qualified immunity); <u>Gonzalez v. Ahmed</u>, 67 F. Supp. 3d 1145, 1157 (N.D. Cal. 2014) (denying qualified immunity where plaintiff's version of the facts established doctor did not reexamine plaintiff or amend treatment plan despite worsening symptoms, resulting in extreme pain and a perforated appendix); <u>Masden v. Risenhoover</u>, 2013 WL 1345189, at *17 (N.D. Cal. Mar. 29, 2013) (summary judgment for nurse inappropriate where evidence showed that nurse "continued to follow an ineffective course of pain treatment for Plaintiff despite his repeated complaints that her actions were exacerbating his condition and causing severe side effects").

**RECOMMENDATION**

For the reasons discussed above, IT IS RECOMMENDED that the Court issue an Order: (1) accepting and adopting this Report and Recommendation; and (2) denying Defendants' Motion for Summary Judgment.

DATED: March 2, 2021.

_____
/S/
CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE

**NOTICE**

     Reports and Recommendations are not appealable to the Court of Appeals, but may be subject to the right of any party to file objections as provided in the Local Rules Governing the Duties of Magistrate Judges and review by the District Judge whose initials appear in the docket number.  No notice of appeal pursuant to the Federal Rules of Appellate Procedure should be filed until entry of the judgment of the District Court.